PETER H. CUTTITTA – SBN 3050
Email: cuttitta@portersimon.com
BRIAN HANLEY – SBN 9052
Email: hanley@portersimon.com
PORTER SIMON
Professional Corporation
675 Sierra Rose Dr., Suite 116
Reno, NV 89511
Telephone: (775) 322-6767
Facsimile: (530) 587-1316

Attorneys for Plaintiffs,
SUSAN K. MYERS and MICHAEL F. MYERS

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| SUSAN K. MYERS and MICHAEL F. MYERS, Individuals<br><br>PLAINTIFFS<br><br>v.<br><br>JAMES ARCHIBALD, an individual; KARL HAHN, an individual; PORT CAPITAL MANAGEMENT, a limited liability corporation; INSURATIVE PREMIUM FINANCE (JERSEY) LIMITED, a business entity of unknown form; INSURATIVE RISK SOLUTIONS US, a corporation; DEUTSCHE BANK ALEX. BROWN, a corporation; DEUTSCHE BANK SECURITIES, INC., a corporation; AMERICAN GENERAL LIFE INSURANCE COMPANY; ALLIANZ LIFE INSURANCE COMPANY OF AMERICA; ING SECURITY LIFE OF DENVER INSURANCE COMPANY<br><br>DEFENDANTS. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1) **Fraudulent Misrepresentation (American General and Others)**<br>2) **Fraudulent Concealment (American General and Others)**<br>3) **Fraudulent Misrepresentation (ING and Others)**<br>4) **Fraudulent Concealment (ING and Others)**<br>5) **Negligent Misrepresentation (All Defendants)**<br>6) **Breach of Contract (INSURATIVE)**<br>7) **Breach of Fiduciary Duty (Hahn *et al*)**<br>8) **Professional Negligence (Hahn *et al*)**<br>9) **Unjust Enrichment (All Defendants)**<br>10) **Conspiracy to Commit Fraud (All Defendants)**<br>11) **Violation of Nevada Consumer Law (All Defendants)** |

/ / /

/ / /

/ / /

/ / /

For their Causes of Action in this matter, PLAINTIFFS allege as follows:

## I.   JURISDICTION AND VENUE

1.      This is an action by PLAINTIFFS, SUSAN K. MYERS ("S. MYERS") and MICHAEL F. MYERS ("M. MYERS") (collectively "PLAINTIFFS" or "the MYERS") arising out of the sale of millions of dollars of life insurance coverage to each of them, the purchase of which was financed by borrowing from a lender, and which was the result of fraudulent and other wrongful conduct of the DEFENDANTS.  As a proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS have suffered millions of dollars in damages.  DEFENDANTS' motive for engaging in this fraudulent scheme was not to benefit PLAINTIFFS but to earn hundreds of thousands of dollars in improper commissions for themselves.   Essentially DEFENDANTS used the wealth and borrowing power of PLAINTIFFS as security for a loan to pay premiums for the purchase of policies to generate large commissions for themselves, to the financial detriment and damage of PLAINTIFFS.

2.      PLAINTIFFS' claims include fraudulent misrepresentation, fraudulent concealment, and conspiracy to commit the wrongs described herein, as well as negligence and breach of contract. PLAINTIFFS seek compensatory damages as well as punitive damages as a means of punishing and making an example of DEFENDANTS, and each of them, for this illegal and wrongful conduct.  Subject matter jurisdiction is proper in this Court as the parties are completely diverse and there exists more than $75,000.00 in controversy, excluding interest and costs.  28 U.S.C. §1332.

3.      Venue is appropriate in the northern division of the District of Nevada pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## II.   OVERVIEW OF THIS CASE

4.      S. MYERS and M. MYERS are husband and wife.  They reside in Incline Village, Nevada, and are citizens of the State of Nevada.  They have been married since 2002.

5.      In 2008, the PLAINTIFFS entered into agreements to purchase life insurance policies from AMERICAN GENERAL LIFE INSURANCE COMPANY ("AMERICAN GENERAL") and ALLIANZ LIFE INSURANCE COMPANY OF AMERICA ("ALLIANZ LIFE").  PLAINTIFFS

entered into these transactions, and secured premium financing to do so, based on the advice, representations and urging of JAMES ARCHIBALD ("ARCHIBALD"), KARL HAHN, ("HAHN"), PORT CAPITAL MANAGEMENT, LLC ("PORT CAPITAL"),  AMERICAN GENERAL, ALLIANZ LIFE, and INSURATIVE PREMIUM FINANCE (JERSEY) LIMITED ("INSURATIVE FINANCE") and INSURATIVE RISK SOLUTIONS US ("INSURATIVE RISK") (collectively "INSURATIVE "). Specifically, these DEFENDANTS convinced the PLAINTIFFS that the life insurance polices that they recommended PLAINTIFFS purchase be bought using premiums borrowed from a lender, which strategy would provide PLAINTIFFS with "free" life insurance benefits that would enable them to maintain financial flexibility during their lives and provide a significant benefit to their heirs upon their deaths.  These DEFENDANTS further encouraged the PLAINTIFFS to rely on DEFENDANTS' expertise in arranging for the premium financing and for the creation of irrevocable life insurance trusts DEFENDANTS recommended to own the life insurance policies in order to avoid any estate tax on the life insurance proceeds payable on death of PLAINTIFFS.

6.      By the foregoing conduct, DEFENDANTS engaged in a pattern of fraudulent misrepresentations, fraudulent concealment, deceptive sales practices, and other wrongdoing in order to accomplish the goal of enriching themselves to the substantial financial detriment of PLAINTIFFS. PLAINTIFFS relied on DEFENDANTS' expertise and advice in deciding to follow DEFENDANTS' recommendations regarding the insurance program described herein.

7.      To implement this scheme to defraud PLAINTIFFS, certain trusts were formed to be the owners of the insurance policies: 1) The "Susan Myers Massachusetts Trust," dated July 11, 229 ("S. Myers Purported Trust"), the trustees of which were originally Lynn Buskey and Shawn McCarthy of Buskey & McCarthy, LLP, Boston, Massachusetts, and 2) "The Michael Myers Massachusetts Trust," dated December 3, 2008 ("M. Myers Purported Trust") the trustees of which were originally Lynn Buskey and Shawn McCarthy of Buskey & McCarthy, LLP, Attorneys, Boston, Massachusetts. However, these trustees have since resigned.  PLAINTIFFS allege that these trusts were never properly formed or, if formed, are void *ab initio and a nullity* since they were merely the instruments of the fraud, corruption, collusion and wrongdoing by DEFENDANTS, and each of them, as alleged herein.

/ / /

8.     At the times DEFENDANTS were encouraging and recommending the purchase of both the policies and the procurement of financing, they knew, but did not disclose to the PLAINTIFFS, that the financing arrangement for paying the premiums for the AMERICAN GENERAL Policy and the ALLIANZ LIFE Policy was likely to result in significant costs and risk of serious adverse financial consequences to PLAINTIFFS, that the amount of insurance purchased was excessive based on DEFENDANTS' inflated evaluation of PLAINTIFFS' assets, that the insurance sold to PLAINTIFFS was unsuitable in both the amounts and other terms of coverage, and that the means by which this insurance was being sold was fraudulent and wrongful.   DEFENDANTS failed to disclose basic facts and risks regarding the premium financing, obtained premium financing based on misrepresented facts and omitted material information pertaining to the availability of capital accumulating in both policies, each of which was material to PLAINTIFFS' decision to allow the policies to be purchased in the manner which DEFENDANTS implemented on PLAINTIFFS' behalf.

9.     After the insurance Policies were issued and in force, DEFENDANTS wrongfully directed, authorized, or allowed the transfer of PLAINTIFFS' assets from one institution to another, which resulted in the premium loan amount being "called" as due in full.  As a result of this "call," triggered by DEFENDANTS' conduct, PLAINTIFFS were required to pay significant amounts to satisfy the loan.  In allowing this transfer of assets to occur, DEFENDANTS breached their fiduciary and other duties to PLAINTIFFS by acting adversely to PLAINTIFFS' personal and financial interests or failed to act in PLAINTIFFS' personal and financial interests, resulting in the damages to PLAINTIFFS as alleged herein.  DEFENDANTS not only conspired and colluded with one another in carrying out this fraudulent and illegal scheme to use PLAINTIFFS' assets as security for the loans to generate large commissions for themselves, but they concealed this fact from PLAINTIFFS.  Finally, DEFENDANTS acted wrongfully in authorizing and ratifying each other's wrongful conduct and in acting on behalf of each other as agents of other DEFENDANTS as principals under the law.  As a result of DEFENDANTS' misrepresentations, nondisclosures, fraudulent actions, breaches of various fiduciary and other obligations, and negligence, PLAINTIFFS have incurred losses of millions of dollars.

/ / /

/ / /

### III.   **PARTIES**

10.   At all relevant times, PLAINTIFF S. MYERS was an individual who was and is a Citizen of the State of Nevada.

11.   At all relevant times, PLAINTIFF M. MYERS was an individual who was and is a Citizen of the State of Nevada.

12.   Upon information and belief, PLAINTIFFS allege that DEFENDANT HAHN is a resident of and a Citizen of the State of New Hampshire.  At all relevant times, HAHN was a financial advisor to PLAINTIFFS while employed as a Managing Director at DEUTSCHE BANK ALEX. BROWN ("DB ALEX BROWN"), the U.S. Private Client Services division of DEUTSCHE BANK SECURITIES INC. ("DB SECURITIES") (collectively "DEUTSCHE BANK"), and subsequent to his departure from DB ALEX BROWN in or around June 2009, as a Managing Director at Oppenheimer Bank.  At all relevant times, HAHN acted as a financial manager of the PLAINTIFFS' assets, and provided investment and financial advice to PLAINTIFFS, directly or indirectly, with respect to money, securities and other investments and property in PLAINTIFFS' portfolios.  As a result, during the relevant times herein, HAHN acted in a position of trust and confidence with PLAINTIFFS, and in a fiduciary capacity with each of them, and in providing the investment and financial advice to PLAINTIFFS described above did so on behalf of himself, and the other DEFENDANTS, and was acting in his capacity as an agent and/or employee of each other DEFENDANT.

13.   At all relevant times, DEFENDANT ARCHIBALD was and is a resident of Portsmouth, New Hampshire and a Citizen of the State of New Hampshire.  At all relevant times, ARCHIBALD was a life insurance agent, appointed by the DEFENDANT insurers named herein, and each of them, to sell life insurance products to the public, including PLAINTIFFS, and was also acting in a capacity as agent and employee and as a Managing Partner for DEFENDANT PORT CAPITAL. During the relevant times herein, ARCHIBALD provided life insurance advice to PLAINTIFFS, on behalf of himself, PORT CAPITAL, and the other DEFENDANTS, and was acting in his capacity as an agent and/or employee of each other DEFENDANT.

14.   At all relevant times, DEFENDANT PORT CAPITAL was a limited liability corporation through which life insurance and related products to the general public, including PLAINTIFFS, were

1  sold.  At all relevant times, PORT CAPITAL had its principal place of business in Portsmouth, New

2  Hampshire and it was and is a Citizen of the State of New Hampshire.

3      15.    At all relevant times, DEFENDANT INSURATIVE RISK was and is a corporation

4  organized under the laws of the State of Connecticut and a Citizen of the State of Connecticut.  At all

5  relevant times, INSURATIVE RISK marketed, sold and provided life insurance premium financing in

6  the U.S. for a foreign business entity, DEFENDANT INSURATIVE FINANCE.

7      16.    At all relevant times, DEFENDANT INSURATIVE FINANCE was a foreign business

8  entity providing life insurance premium financing, which marketed its services exclusively in the U.S.

9  through INSURATIVE RISK.

10     17.    At all relevant times, DEFENDANT DB ALEX BROWN was the private client services

11 division of DB SECURITIES, a wholly-owned subsidiary of Deutsche Bank AG, a registered broker

12 dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934, and a member of the Financial

13 Regulatory Authority.  DB ALEX BROWN provides investment management and brokerage services to

14 retail customers, and provided such to PLAINTIFFS.  DB ALEX BROWN is headquartered in

15 Baltimore, Maryland.  PLAINTIFFS are informed and believe, and on that basis allege that DB ALEX

16 BROWN, and DEUTSCHE SECURITIES are Citizens of either Maryland or New York.

17     18.    At all relevant times, DEFENDANT AMERICAN GENERAL was and is a Texas

18 corporation, and a Citizen of the State of Texas, authorized to sell life insurance products in the State of

19 Nevada.

20     19.    At all relevant times, DEFENDANT ALLIANZ LIFE was and is a Minnesota

21 corporation and a Citizen of the State of Minnesota, authorized to sell life insurance products in the State

22 of Nevada.

23     20.    At all relevant times, DEFENDANT ING SECURITY LIFE OF DENVER INSURANCE

24 COMPANY ("ING"), was and is a Colorado corporation and Citizen of the State of Colorado and was

25 authorized to sell life insurance products in the State of Nevada.

26                      IV.    **NON-PARTIES**

27     21.    At all relevant times, Buskey & McCarthy, LLP ("Buskey & McCarthy") was a limited

28 liability partnership which provided legal services in Boston, Massachusetts, and which provided legal

and professional services to PLAINTIFFS, as herein described.   Buskey & McCarthy was and is a Citizen of the State of Massachusetts.

22.     At all relevant times, Lynn A. Buskey ("Buskey"), was and is an attorney at law and a partner at Buskey & McCarthy.  She was a trustee of the S. Myers Purported Trust and the M. Myers Purported Trust until her resignation on March 19, 2009.

23.     At all relevant times, Shawn B. McCarthy ("McCarthy"), was and is an attorney at law and a partner at Buskey & McCarthy.   He was a trustee of the S. Myers Purported Trust and the M. Myers Purported Trust until his resignation on March 19, 2009.

24.     At all relevant times, Sanne Trust Company Limited ("Sanne"), a wholly owned subsidiary of Sanne Holdings Limited, was a foreign business entity providing management services of trust instruments.

## V.     AGENCY AND INFORMATION ALLEGATIONS

25.     PLAINTIFFS allege that in connection with acts and events alleged herein, the DEFENDANTS, and each of them, conspired with each other to commit the wrongs and illegal acts described herein, authorized or ratified the acts of each other, were agents or employees of the other, and acted within the scope of such agency, employment or conspiracy to carry out its illegal purpose of selling fraudulent life insurance premium financing  and excessive and unsuitable life insurance coverage to the public, including PLAINTIFFS.  Accordingly, each is jointly and severally liable for the acts of each other DEFENDANT as alleged herein.

26.     All allegations made in this Complaint are based on information and belief, except those allegations that pertain to the PLAINTIFFS, which are based on their personal knowledge.  The PLAINTIFFS' information and belief is based on, *inter alia*, the investigation conducted by PLAINTIFFS and PLAINTIFFS' attorneys after their retention.  Each and every allegation and factual contention contained in this complaint has evidentiary support, or alternatively, pursuant to Federal Rule of Civil Procedure 11(b)(3), is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery by PLAINTIFFS and/or their counsel.

27.     Each of the DEFENDANTS, except as otherwise alleged herein, was acting as the principal or agent of the other, or as an employer or employee of each of the other DEFENDANTS.

1    Thus, each DEFENDANT herein named is responsible for the acts, omissions, and conduct of each other

2    DEFENDANT either because such acts were either authorized or ratified by said DEFENDANTS or

3    DEFENDANT. Such acts, omissions and conduct were within the scope of the agency, employment or

4    legal relationship which each DEFENDANT had with each other DEFENDANT.

5

6                              **VI.    FACTUAL BACKGROUND**

7        **A. The Plaintiffs Rely On Defendants' Representations To Purchase Excessive Life
              Insurance Funded By Complex Premium Financing.**
8

9        28.    S. MYERS acquired substantial wealth after the sale of a company in 1998. Until 2006,

10   the PLAINTIFFS had worked with a single financial advisor for almost a decade regarding the

11   management and oversight of their assets and investments.

12       29.    In June 2006, the MYERS met for the first time with HAHN at the PLAINTIFFS' home

13   in Incline Village, Nevada. HAHN represented that he was a competent investment adviser and broker

14   with Merrill Lynch, a financial advisory company and broker/dealer, who could and would provide

15   advice and counsel regarding the management and oversight of their assets and investments, and provide

16   ongoing investment advice and counseling. During HAHN'S overnight stay with the PLAINTIFFS,

17   HAHN reviewed their investment portfolio and offered to provide wealth management services for

18   them. HAHN touted himself as a wealth manager with more than $1 billion in assets under his

19   management and dropped the names of various athletes whose portfolios he controlled. He described

20   himself as an expert in private wealth management and encouraged the PLAINTIFFS to use his services

21   and skills to benefit their investments and financial planning. HAHN did not disclose to PLAINTIFFS

22   whether he was licensed under Nevada law to permit his practice as a financial advisor.

23       30.    By July 2006, relying on HAHN'S representations, the PLAINTIFFS transferred all of

24   the investment assets and investment portfolios valued in the tens of millions of dollars to Merrill Lynch

25   for management by HAHN. In late 2007, when he transferred to DB ALEX BROWN from Merrill

26   Lynch in late 2007, the PLAINTIFFS were persuaded by HAHN to move their portfolio to DB ALEX

27   BROWN, so it could remain under his management and control.

28   / / /

31.     In January 2008, HAHN again visited the PLAINTIFFS at their Incline Village residence to review the PLAINTIFFS' portfolio and discuss the transfer of their assets to DB ALEX BROWN. The PLAINTIFFS were presented with information regarding the transfer. Based on HAHN'S representation, the PLAINTIFFS understood that HAHN'S management fee would be limited to one percent of the account value per year. The PLAINTIFFS later would discover that HAHN misrepresented the amount of his compensation for his investment portfolio management and that indeed it was much greater. Had they known this they would have inquired into moving their portfolio to another investment adviser whose charges were less.

32.     At the January 2008 meeting, HAHN briefly mentioned the importance of life insurance to individuals with substantial wealth. He proposed that the PLAINTIFFS discuss life insurance with a colleague of his—ARCHIBALD.

33.     In April 2008, both ARCHIBALD and HAHN traveled to Incline Village to market their life insurance proposals to the PLAINTIFFS. The PLAINTIFFS learned that ARCHIBALD was the Managing Partner of PORT CAPITAL. ARCHIBALD and PORT CAPITAL advertised the use of premium financed life insurance as a means of maintaining wealth and adding value to an estate. They represented to PLAINTIFFS that a sound and safe way to buy large amounts of life insurance was to borrow the sums to pay the premium from a lender, so that PLAINTIFFS would have no out of pocket costs. It was represented that the cash value and build-up in the life insurance polices would exceed any interest or other charges on the loan, and it was specifically represented that PLAINTIFFS would never be personally responsible, outside the cash value of the policies, for any debt incurred by virtue of the borrowing to pay the premiums. ARCHIBALD and HAHN represented that this was a "non-recourse" loan, so that PLAINTIFFS assets and investments would never have to be used to pay any debt or interest charges from the borrowing to pay premiums.

34.     While meeting with the PLAINTIFFS, ARCHIBALD and HAHN presented the PLAINTIFFS with various life insurance options each using premium financing. ARCHIBALD and HAHN consistently represented to PLAINTIFFS that by using such financing, there would be no risk or expenditure of out-of-pocket costs to purchase a high value life insurance policy to satisfy the PLAINTIFFS' estate planning needs. ARCHIBALD had prepared, and presented to PLAINTIFFS, a

PORT CAPITAL binder that included three life insurance plans, each accompanied by premium financing options to entice the PLAINTIFFS, each of which would provide a minimum death benefit of at least $20 million. ARCHIBALD focused PLAINTIFFS' attention on a program provided through DEFENDANT AMERICAN GENERAL, promoting it over the others by misrepresenting that it was available at no expense to the PLAINTIFFS, whereas the two other programs were only available at significant cost.

35.     HAHN, ARCHIBALD and PORT CAPITAL represented to PLAINTIFFS that individuals with substantial wealth needed to acquire high value life insurance to protect their assets during their lives, and upon their deaths.

36.     The premium-financed life insurance plans were promoted by HAHN, ARCHIBALD and PORT CAPITAL by representing them as valuable necessities to wealthy individuals in that they would protect PLAINTIFFS' current assets by permitting their purchase with no personal expenditure. To obtain PLAINTIFFS' commitment to their scheme, HAHN and ARCHIBALD used their expertise in the fields of financial planning and insurance to create fear in the PLAINTIFFS about the possibility of an estate tax which could substantially reduce the value of their estate upon their deaths without exploring any other options to protect their assets from tax erosion. Finally, both HAHN and ARCHIBALD stated that the life insurance plans were "complex," but promoted themselves as experts in the packages upon whom PLAINTIFFS could rely. In response to PLAINTIFFS' questions regarding the risk to their personal assets, HAHN and ARCHIBALD specifically denied all risks involved. The PLAINTIFFS relied on their assertions, and believed in the "risk-free" plan promoted by HAHN and ARCHIBALD – that is, that their personal investments and assets would never be required to pay for any of the debt or interest charges incurred as a result of the loans obtained to pay the premium charges for the life policies to be purchased.

37.     At no time during the April 2008 meeting with the PLAINTIFFS did ARCHIBALD or HAHN reveal the actual mechanism and risks of this premium financing arrangement; nor did they explain that the amount of debt and charges incurred as a result of the borrowing could exceed the amount of cash value of the policies so that in order to pay the debt, PLAINTIFFS would have to use their own personal assets and investments to make up any shortfall between the amount of the debt and

the cash value; nor did they advise PLAINTIFFS that they had to provide assets to secure the debt, which had to remain in a financial institution agreed on with the premium financing lender and that the transfer of those assets without the approval of the lender would place the premium loan in default and result in the lender's call of the loan.  Further, neither HAHN nor ARCHIBALD disclosed that there were fluctuating rates of return and build-up of the cash value, and that there were also fluctuating charges for the premium financing loan which could result in the life policies being so depleted in cash value that there would be insufficient funds to pay the debt and other charges for the loan.

38.     HAHN promised to obtain for PLAINTIFFS a "Letter of Credit" from DB ALEX BROWN for PLAINTIFFS to guarantee the premium loan.  HAHN represented that he could do so at no cost, although the cost of such a service would ordinarily be valued at $26,000 or more.   PLAINTIFFS are uncertain whether a true "Letter of Credit" was ever obtained by HAHN as promised.   Nonetheless, eventually the loan was obtained and the policies issued as described herein.

39.     HAHN and ARCHIBALD departed Incline Village without informing the PLAINTIFFS about any specific requirements for obtaining a Letter of Credit or premium financing, purchasing the life insurance coverage, or any commissions that could be generated by a transaction to attain either. Nonetheless, HAHN and ARCHIBALD proceeded to obtain an application for life insurance for S. MYERS.

        B.        **S. Myers is Insured With DEFENDANT American General Financed By A Premium Loan From DEFENDANT INSURATIVE, Generating Undisclosed Commissions for DEFENDANTS.**

40.     Following the April 2008 meeting, ARCHIBALD requested S. MYERS to provide financial information so that he could proceed to apply for the life insurance policy described herein.

41.     In or around April and May 2008, ARCHIBALD and PORT CAPITAL required S. MYERS to use accountant services by  Certified Public Accountant Jerry D. Karcher ("Karcher"). Upon information and belief, S. MYERS understood that Karcher would provide ARCHIBALD and PORT CAPITAL with information about S. MYERS' financial condition in a letter.

42.     On April 22, 2008, S. MYERS received a loan application that required her signature.  S. MYERS contacted ARCHIBALD by email to ask the purpose of the application.  ARCHIBALD confirmed that the document was a loan application that required her signature.  S. MYERS emailed

ARCHIBALD again to inquire about the need for a loan application if they were purchasing life insurance. She requested ARCHIBALD'S assistance, reminding him that she understood HAHN was obtaining a "Letter of Credit" from DEUTSCHE BANK which she was told was all that was necessary to obtain the proposed loan to pay the premium for her AMERICAN GENERAL Life Policy. ARCHIBALD assured S. MYERS that the "non-recourse" loan protected her and her assets in the event of a severe reduction in her portfolio's value. ARCHIBALD misrepresented that the interest rate on the loan would be fixed, and that the loan could not be called against them. ARCHIBALD further represented that the application page was the "official loan application signature page." He induced her to sign by adding that he already had "favorable news" from AMERICAN GENERAL.

43.     ARCHIBALD and PORT CAPITAL failed to disclose to S. MYERS that the AMERICAN GENERAL policy was being purchased not because it offered the best price for the insurance coverage provided but because it would maximize the commissions payable to DEFENDANTS. At the time there were other policies available of comparable quality that could be obtained on the life of S. MYERS at a much lower cost and with less financial risk; this fact was concealed by ARCHIBALD and HAHN from S. MYERS.

44.     During this time, S. MYERS requested additional information about PORT CAPITAL and ARCHIBALD from both ARCHIBALD and HAHN.  ARCHIBALD and HAHN continued to assure S. MYERS that they were experts in the field of financial planning and life insurance, that her personal assets were not exposed to pay the premiums for the AMERICAN GENERAL policy, and that HAHN was obtaining the line of credit so that the premium financing could be obtained at no charge to S. MYERS.  ARCHIBALD also assured S. MYERS that he maintained a support staff of approximately 40 people in Wellesley, Massachusetts.

45.     On June 12, 2008, ARCHIBALD emailed S. MYERS to let her know that AMERICAN GENERAL had approved her as an insured.  ARCHIBALD represented that she was rated as a Preferred Plus, the highest and healthiest rating available from AMERICAN GENERAL.

46.     On July 20, 2008, an Indexed Flexible Premium Adjustable Universal Life Insurance Policy (No. A70016243L) from AMERICAN GENERAL ("AIG Life Policy") was issued on the life of S. MYERS for $22.9 million. The S. Myers Purported Trust was named as the owner of the AIG Life

Policy.  PLAINTIFFS are informed and believe, and thereon allege, that a true and correct copy of the AIG Life Policy is attached hereto as **EXHIBIT 1** and incorporated herein by reference.  The annual premium for the first eight years was $1,373,865.37.  S. MYERS was led to believe by representations from DEFENDANTS before the Policy was issued that at year nine, there would be no further annual premium payments required.  Although ARCHIBALD and HAHN had told S. MYERS that the premiums would be paid through a Letter of Credit, she discovered after the Policy was issued and in force that a loan was attached to the policy, and that the loan balance upon the payment of the first year's premium would be $1,453,885 but that the guaranteed cash surrender value of the Policy would be $783,077.  She further learned after the Policy was issued and in effect that by the end of year 20, the loan balance could exceed $33.1 million, or $10.2 million more than the face value of the policy.

### C.   Irrevocable Life Insurance Trusts are Established to Hold PLAINTIFFS' Policies.

47.   Once S. MYERS was approved for life insurance, ARCHIBALD arranged for Buskey & McCarthy, and its principals, Buskey and McCarthy, to form the S. Myers Purported Trust, an irrevocable life insurance trust intended to own the AIG Life Policy.  ARCHIBALD concealed from PLAINTIFFS the need or purpose for the trust, the manner of compensation for Buskey & McCarthy, or the work to be performed by Buskey & McCarthy and its principals.  Instead he represented that they were professional trustees who were selected by AIG Life to complete the life insurance transaction, and that is was in PLAINTFFS' best interest to proceed in this manner.

48.   ARCHIBALD arranged for the AIG Life Policy premiums to be funded by a loan from INSURATIVE.  True and correct copies of the following documents between INSURATIVE and S. MYERS pertaining to this loan are attached hereto as EXHIBITS, as indicated, and incorporated herein by this reference:

1.   **EXHIBIT 2**: INSURATIVE Policy Trustee Facility Agreement, dated July 16, 2008;

2.   **EXHIBIT 3**: Notice of Intent to Borrow, dated July 16, 2008, signed by Buskey;

3.   **EXHIBIT 4**: Deed of Accession, dated July 16, 2008;

4.   **EXHIBIT 5**: Buskey & McCarthy Letter to Sanne, dated July 16, 2008;

5.   **EXHIBIT 6**: INSURATIVE Loan Summary, dated July 16, 2008.

49.     Neither Buskey nor McCarthy, nor DEFENDANTS, disclosed to the PLAINTIFFS that substantial commissions were to be paid by DEFENDANTS to their firm or to themselves as individuals for their services in forming the trust.  No DEFENDANT disclosed to the PLAINTIFFS the requirement of DEFENDANT INSURATIVE that the trusts be established by Buskey & McCarthy, nor the fact that DEFENDANTS as well as McCarthy and Buskey, as individuals, were to earn significant sums by participating in this fraudulent scheme to use PLAINTIFFS' wealth to generate significant commissions for the DEFENDANTS.  PLAINTIFFS are informed and believe, and thereon allege that both McCarthy and Buskey were individually paid as much as $100,000 by DEFENDANTS for their services.  The payment of such commissions to Buskey and McCarthy as individuals resulted in a conflict of interest between Buskey & McCarthy and PLAINTIFFS as clients of that firm.  This conflict was encouraged and in fact arranged by DEFENDANTS.

50.     S. MYERS believed that her husband and children were beneficiaries of her trust and provided the information to Buskey & McCarthy for inclusion in the S. Myers Purported Trust.  She was told by DEFENDANTS that the trust would provide her with flexibility to allow distributions to her spouse and descendants, as well as for other necessary and unforeseen events.

51.     Ultimately, the S. Myers Purported Trust was funded by a loan from INSURATIVE, which was then used by the trust to pay for the first year of S. MYERS' AIG Life Policy.

52.     The firm, Buskey & McCarthy, also prepared and established the M. Myers Purported Trust so that a life insurance policy on the life of M. MYERS could be issued as described herein, which also was paid for through premium financing.

**D.     DEFENDANTS HAHN and ARCHIBALD Persuade MICHAEL MYERS to Acquire for $15 Million in Life Insurance from DEFENDANT ALLIANZ LIFE Using Similar Premium Financing, Generating Additional Undisclosed Commissions for DEFENDANTS.**

53.     Following the sale of the AIG Life Policy to S. MYERS and formation of her trust, ARCHIBALD and PORT CAPITAL, with HAHN'S assistance and encouragement, and the participation, authorization and ratification of the remaining DEFENDANTS, persuaded M.MYERS to purchase a life insurance policy with a face value which was unsuitable and excessive for his needs under financial circumstances that posed a significant financial risk to M. MYERS and also S.MYERS.

54.     In carrying out this sale, ARCHIBALD and PORT CAPITAL, with HAHN'S assistance and encouragement, and the participation, authorization and ratification of the remaining DEFENDANTS, proceeded to persuade M. MYERS to purchase a policy of life insurance. They generated an application for insurance for M. MYERS that stated his personal assets were $35 million, and his annual income as $800,000, which was untrue. What DEFENDANTS did was use the same assets to support M. MYERS' policy as the assets of S. MYERS. ARCHIBALD reassured the PLAINTIFFS that this representation was acceptable and beneficial to PLAINTIFFS. PLAINTIFFS relied on ARCHIBALD'S assurance that the assets were appropriately considered, believing the assets of S. MYERS could be used in this manner to benefit M. MYERS, which is contrary to the standards used for underwriting life insurance coverage for an individual.

55.     ARCHIBALD then knowingly presented the false information to various life insurers, ultimately obtaining an ALLIANZ LIFE Policy to overinsure M. MYERS. M. MYERS was initially told that the amount of life insurance would be $10 Million. In reality, ARCHIBALD, PORT CAPITAL and HAHN secretly were attempting to obtain life insurance for several million dollars more than they represented to M. MYERS in order to generate larger commissions to themselves, again using the wealth and borrowing power of PLAINTIFFS to generate premiums that would result in the payment of large commissions to DEFENDANTS. The amount of life insurance they were seeking on M. MYERS was unsuitable and excessive under life insurance underwriting standards just as the amount on S. MYER'S life was unsuitable and excessive. This conduct on their part violates not only life insurance underwriting standards but industry standards for the sale of such life insurance practices.

56.     Effective November 19, 2008, ALLIANZ LIFE issued Policy No. 60034408 ("Allianz Life Policy") naming M. MYERS as the insured and the M. Myers Purported Trust as owner with a death benefit of $15 million and an annual premium of $886,325 for the first twelve years. DEFENDANTS ARCHIBALD and HAHN told M. MYERS that no more premiums would be required thereafter, and that his policy would be fully paid. PLAINTIFFS are informed and believe, and thereon allege, that a true and correct copy of the Allianz Life Policy is attached hereto as **EXHIBIT 7** and incorporated herein by reference.

/ / /

57.     ARCHIBALD arranged for the M. MYERS' Allianz Life Policy to be financed by INSURATIVE, which required collateralization equal to the initial annual premium.  True and correct copies of the following documents between INSURATIVE, M. MYERS and PLAINTIFFS pertaining to this loan are attached hereto as EXHIBITS, as indicated, and incorporated herein by this reference:

1.     **EXHIBIT 8**: INSURATIVE Summary of Terms, dated December 3, 2008;

2.     **EXHIBIT 9**: Final Control Agreement, dated November 12, 2008;

3.     **EXHIBIT 10**: First Edition Control Agreement, dated November 10, 2008;

4.     **EXHIBIT 11**: Notice of Sole Control, dated November 12, 2008;

58.     As part of the loan arrangement there was a control agreement between Sanne, as a Collateral Trustee for INSURATIVE, DB ALEX BROWN and PLAINTIFFS.  Under this arrangement, S. MYERS pledged assets as collateral for the loan which assets were in an account at DB ALEX BROWN; the agreement prohibited DB ALEX BROWN from complying with any orders or instructions from S. MYERS regarding the pledged assets.  The First Edition Control Agreement presented to S. MYERS included handwritten notes indicating that it was the first edition and not for signing, and included a rejection of paragraph four entitled "Trading Permitted: No Distributions or Liquidation." The Acknowledgment and Acceptance page of the Control Agreement was executed by HAHN as Managing Director for DB ALEX BROWN.  The space for S. MYERS' signature was marked void.

59.     ARCHIBALD informed S. MYERS that he was aware of a mistake on the First Edition Control Agreement and emailed her that a corrected version would be issued.  The revised Control Agreement was sent to S. MYERS on November 12, 2008.

60.     S. MYERS requested time to seek legal advice regarding the substance of the Final Control Agreement as she was concerned about freezing approximately $886,000 in an account to be used as collateral to finance M. MYERS' Policy.  ARCHIBALD falsely informed S. MYERS that the money to be set aside would never be lost and, upon M. MYERS' death, S. MYERS would collect the full death benefit under M. MYERS' Allianz Life Policy and be able to withdraw all income, interest and dividends.  In reliance upon this assurance, S. MYERS accepted the terms.

61.     S. MYERS requested information from HAHN, who inaccurately advised that she should not be concerned about trading within the account.  He falsely represented that S. MYERS could

perform any actions on the account as she pleased, including but not limited to making trades on the account. HAHN further represented that he would review the account status annually with S. MYERS.

62.     The Final Control Agreement was executed by S. MYERS, and included as an exhibit a Notice of Sole Control to HAHN at DB ALEX BROWN advising him of Sanne's control over an S. MYERS' DB ALEX BROWN account as collateral trustees for INSURATIVE. The Notice of Sole Control incorporated a November 6, 2008 Control Agreement predating the Final Control Agreement of November 12, 2008. Although the letter instructed HAHN to provide a copy of the notice to S. MYERS, this was not done.

63.     As of December 2008, M. MYERS had obtained his Allianz Life Policy and the M. Myers Purported Trust was formed and named the owner of the policy.

### E.     DEFENDANT HAHN and DEFENDANT DB ALEX BROWN Part Ways and the PLAINTIFFS Learn that Their Premium Loans are in Default.

64.     In the summer 2009, S. MYERS received notice from HAHN that he had left his position at DB ALEX BROWN to become a Managing Director of Investments at Oppenheimer & Co., Inc. ("Oppenheimer"). HAHN advised the PLAINTIFFS that he wanted to continue to manage their investments and provide financial advice to them in his new position, but that to do so they needed to transfer their assets from DEUTSCHE BANK to Oppenheimer, which PLAINTIFFS agreed to do because of their continued trust and confidence in him and his abilities and their desire to continue to utilize his services as their financial adviser. The PLAINTIFFS asked if any money should be left behind in their account upon the transfer. HAHN informed PLAINTIFFS that he would arrange for the transfers and falsely represented that there was no need to leave any amounts at DEUTSCHE BANK. HAHN subsequently accomplished the transfer of assets form DEUTSCHE BANK to Oppenheimer.

65.     HAHN's transfer of the assets triggered a default in the terms of the INSURATIVE financing of both S. MYERS' AIG Life Policy and M. MYERS' Allianz Life Policy. As a result, PLAINTIFFS received two letters, dated July 22, 2009, from in-house legal counsel for INSURATIVE referring to the two trusts, and stating that the loans which had been obtained to pay the premiums on these polices were in default. INSURATIVE demanded $1,465,809 by July 28, 2009 as payment of outstanding principal, interest, and expenses for the loan to the S. Myers Purported Trust. The second

letter demanded payment of $944,867 by July 28, 2009 as payment of outstanding principal, interest and expenses for the loan to the trust.  Both letters stated that any unpaid amount would be enforced against the life policies and the DEUTSCHE BANK line of credit.  Neither INSURATIVE, nor any other DEFENDANT, disclosed to PLAINTIFFS that INSURATIVE was seeking capital for its normal business activities despite their knowledge of INSURATIVE'S need for capital.

66.     The total amount demanded by INSURATIVE was $2,410,676.  This amount included a penalty of $10,000 per policy without explanation or justification in the terms of the INSURATIVE financing agreements.

67.     The default occurred due to HAHN'S reckless, premature and unauthorized withdrawal of collateral accounts from DEUTSCHE BANK when he arranged for a transfer of assets to Oppenheimer.  This transfer was for the purpose of allowing HAHN and the other DEFENDANTS to continue to carry out the fraudulent life insurance and premium financing scheme which is described herein, and was a continuance of the concealment and deception in which DEFENDANTS had engaged over the several previous months.  Although required by the Final Control Agreement and the Notice of Sole Control, HAHN and DB ALEX BROWN failed to file the proper forms to notify both ARCHIBALD and INSURATIVE of the intention of the PLAINTIFFS to transfer their portfolio to Oppenheimer.  Upon information and belief, the PLAINTIFFS allege that HAHN had never properly lodged Letters of Credit as collateral for the loan to S. Myers Purported Trust, nor had he properly established a collateral account to guarantee the premium financing of M. MYERS' Allianz Life Policy, as required by INSURATIVE.

68.     In the interim, in March 2009, Buskey and McCarthy each resigned as trustees of the two purported trusts formed to hold the life insurance policies issued to PLAINTIFFS, without securing replacements, or making any attempt or effort to inform PLAINTIFFS of the need for a replacement.  The trusts were thus without a trustee although after the loan defaults were received, without legal authority, Buskey continued to act in the capacity of a trustee by communicating with INSURATIVE.

69.     PLAINTIFFS were shocked and dismayed upon receiving the loan default notices and were left scrambling to determine what had happened to cause the default, and what steps needed to be taken to preserve the policies.  While they anxiously attempted to locate funding to pay off the defaulted

loans, ARCHIBALD and PORT CAPITAL, acting on behalf of themselves and the other

DEFENDANTS,  at once took advantage of the PLAINTIFFS' confusion and enthusiastically presented

them with another life insurance option from DEFENDANT ING.  ARCHIBALD falsely represented

the change as an imperative.  S. MYERS informed ARCHIBALD that she was not interested in pursuing

new life insurance, but preferred to finalize the financial problem they suddenly found themselves in.  In

violation of Nevada insurance regulations, ARCHIBALD falsely represented that AMERICAN

GENERAL'S rating had diminished, as had that of DEUTSCHE BANK and the financial stability of the

AIG Life Policy was dubious.  Thus, he falsely represented that is was in the best financial interest of S.

MYERS to replace the AIG Life Policy with a similar policy issued by DEFENDANT ING.

70.    At the same time, INSURATIVE aggressively sought immediate repayment of the loan

balances from the PLAINTIFFS, forcing the PLAINTIFFS to seek alternative financing to cover the

necessary payment.  PLAINTIFFS found themselves relying on the same DEFENDANTS to extricate

themselves from the situation created by the DEFENDANTS themselves.

71.    PLAINTIFFS were informed by HAHN and ARCHIBALD that the Letter of Credit

allegedly procured by HAHN from DEUTSCHE BANK could not be established at Oppenheimer as

HAHN'S new employer would not issue lines of credit.  The PLAINTIFFS subsequently learned that a

properly lodged Letter of Credit or a properly established collateral account should not and could not

have been removed from DEUTSCHE BANK.  Upon asking HAHN for assistance, the PLAINTIFFS

were reassured that he had his "team" attempting to rectify the problems that had been created by the

loan default.

72.    At the same time, ARCHIBALD continued to push the PLAINTIFFS in a single direction

while concealing alternative options with them.  He falsely represented that the PLAINTIFFS had to

utilize another investment bank to avoid the default.  Additionally, ARCHIBALD falsely represented

that S. MYERS needed to purchase a new life insurance policy to replace her AIG Life Policy.

ARCHIBALD also promoted a transition to a "bond financing" to cover the annual premium required by

the new ING Policy.

73.    Due to the urgent need to repay the defaulted loan, the PLAINTIFFS acquired a short-

term line of credit from Bank of America to serve as a bridge loan until additional funding could be

1  obtained. INSURATIVE'S pressure on the PLAINTIFFS to repay the amount or to risk the seizure of

2  the existing life insurance policies was in violation of the loan terms.

3      74.    Despite multiple requests during this period made to ARCHIBALD, INSURATIVE,

4  HAHN, and Buskey & McCarthy, PLAINTIFFS were unable to obtain documents containing the loan

5  terms with INSURATIVE, the line of credit previously provided by DEUTSCHE BANK, any letters of

6  credit prepared by HAHN, disclosures regarding the pay-off demanded by INSURATIVE, disclosures

7  regarding the manner of compensation to INSURATIVE for the loans issued, and letters from HAHN to

8  INSURATIVE regarding the transfer of the PLAINTIFFS' assets to Oppenheimer. The DEFENDANTS

9  rejected the PLAINTIFFS' attempts to obtain information about the status of the policies, the loan, the

10  supposed line of credit, and the financing for the premiums which had been arranged for them by

11  DEFENDANTS, and concealed this information from PLAINTIFFS.

12      75.    By August 11, 2009, PLAINTIFFS obtained a Loan Management Account (hereinafter,

13  "LMA") through Merrill Lynch which provided funds to pay off the loan amount to INSURATIVE

14  which then totaled $2,424,521, including interest incurred from the original demand date of July 28,

15  2009. Prior to making the necessary payment, S. MYERS requested that ARCHIBALD confirm that the

16  necessary payment would release the PLAINTIFFS from any further relationship with INSURATIVE

17  and satisfy all obligations to them. ARCHIBALD refused to confirm this.

F.    **DEFENDANTS PORT CAPITAL and ARCHIBALD Encourage S. MYERS to
      Surrender her AMERICAN GENERAL Policy for an ING Policy Issued Without
      Full Underwriting and Generating New and Improper Commissions for Them.**

20      76.    By emphasizing and misrepresenting that AMERICAN GENERAL was in financial

21  jeopardy, ARCHIBALD persuaded S. MYERS to surrender the AIG Life Policy and replace it with the

22  new policy issued by DEFENDANT ING.  While ARCHIBALD made representations that the AIG

23  Life Policy was in financial jeopardy, he knew or recklessly disregarded information that this policy and

24  AMERICAN GENERAL'S subsidiaries and their products were stable. ARCHIBALD knew that he

25  was acting contrary to good faith industry standards in making false representations to S. MYERS in

26  order to twist her out of the AIG Life Policy into a new policy issued by ING. He did so only to

27  generate a new first year commission for himself and other DEFENDANTS, and not to benefit S.

28  MYERS. ARCHIBALD failed to disclose any commissions he received for placing the ING Policy, but

1  instead falsely represented that he could not receive additional commissions on the sale of a new policy

2  due to a law restricting the receipt of multiple commissions within a four year period. ARCHIBALD

3  also failed to disclose to the PLAINTIFFS that he was aware of INSURATIVE'S need for capital, and

4  that this was a motivation behind INSURATIVE'S sending the default notice to PLAINTIFFS.

5        77.    The AIG Life Policy was surrendered and the S. Myers Purported Trust received

6  approximately $733,000, approximately $50,000 less than the guaranteed surrender value and a

7  forfeiture of more than $600,000 based on the initial premium payment; this result was concealed from

8  PLAINTIFFS. A portion of the surrendered value was then used to purchase the ING Policy, No.

9  1650298 ("ING Policy"). PLAINTIFFS are informed and believe, and thereon allege, that a true and

10 correct copy of the ING Policy is attached hereto as **EXHIBIT 12** and incorporated herein by reference.

11 Although Buskey and McCarthy had previously resigned as trustees of the S. Myers Purported Trust, the

12 ING Policy named as its owner the S. Myers Purported Trust and the trustee was once again identified

13 as Buskey. The ING Policy required an annual premium of $1,070,000, was issued with a death benefit

14 of $23 million, and a cash surrender value of $0.   DEFENDANTS concealed from the PLAINTIFFS

15 that there was no cash surrender value to the ING Policy. Less than half of the initial premium was paid

16 out of the monies received after the surrender of the AIG Life Policy. However, not all of the said AIG

17 Life Policy cash surrender value was used for this purpose. Approximately $266,000 was returned to S.

18 MYERS' LMA in or about September 2009. S. MYERS has not been provided an accounting of the

19 balance of the surrender value of the AIG Life Policy which was not used to pay the premium for the

20 ING Policy.

21       78.    The ING Policy was written without appropriate full underwriting and due diligence

22 being completed by DEFENDANTS ING. ING knew that its policy was replacing another, yet it failed

23 to undertake the proper review of the application for insurance to determine the risk presented by the

24 transaction and the financial capacity of S. MYERS to pay annual premiums, as well as the detrimental

25 financial consequences to S. MYERS in authorizing the replacement. HAHN, ARCHIBALD, PORT

26 CAPITAL and ING concealed the adverse financial consequences these actions would impose on S.

27 MYERS from the PLAINTIFFS.

28 ///

**G.     AMERICAN GENERAL, ALLIANZ LIFE, ING Pay Over $1 Million in Commissions to its Agents, DEFENDANTS HAHN and ARCHIBALD as Result of Sale of Policy to PLAINTIFFS.**

79.     Neither of the PLAINTIFFS was aware of the substantial commissions generated by the purchase of the life insurance policies by their trusts until after the transactions had been completed. Based on her understanding of industry practice, PLAINTIFFS are informed and believe and thereupon allege that DEFENDANT AMERICAN GENERAL paid at least $1 million in commissions to its agents, HAHN and ARCHIBALD and PORT CAPITAL as a result of the sale of the AMERICAN GENERAL Policy to S. MYERS.  The PLAINTIFFS would not have entered the transactions had they been aware of the excessive compensation to be paid to DEFENDANTS.  PLAINTIFFS are informed and believe and thereon allege that HAHN, ARCHIBALD and PORT CAPITAL, as well as the other DEFENDANTS received significant undisclosed commissions from the sale of the ALLIANZ LIFE policy as well as the ING Policy.

80.     PLAINTIFFS have continued to pay the interest on the LMA since its origination.

**H.     PLAINTIFFS Become Aware of Misdealing and Fraud by DEFENDANTS.**

81.     In December 2009, PLAINTIFFS received a letter from ARCHIBALD regarding various matters pertaining to the status of their life insurance purchases, the trusts and related information.  At that time they became suspicious that DEFENDANTS had engaged in multiple acts of misrepresentation and concealment, as described herein, in order to induce PLAINTIFFS to enter into the insurance transactions described herein.  In part, the PLAINTIFFS learned that INSURATIVE had been seeking capital to raise money for their normal business activities, that ARCHIBALD was already working on a new life insurance policy for S. MYERS prior to the INSURATIVE default, that INSURATIVE had, prior to the calling the loans, approved ARCHIBALD'S request to surrender S. MYERS' AIG Life Policy although S. MYERS had not expressed any intention to do so, and had initiated discussions with a bond financing company to procure bond financing to replace the premium financing arrangement with INSURATIVE.   The PLAINTIFFS would have immediately terminated their relationships with HAHN, ARCHIBALD and PORT CAPITAL and would not have entered into any of the insurance or loan transactions described herein had they known of the fraud, concealment, deceit and misdealing by DEFENDANTS at or before the transactions were entered into, as alleged herein.

82.     The purpose and value of the insurance policies purchased by the PLAINTIFFS with financing through INSURATIVE have been rendered valueless by the acts and omissions of the DEFENDANTS, all of whom acted solely in their own interest and in cooperation among each other with the intent to induce the reliance of the PLAINTIFFS on their expertise, assertions, and affirmations. The PLAINTIFFS did rely on all of the DEFENDANTS, and each of them, for guidance and assistance in the procurement of the high-value life insurance policies.  As a result of this reliance, the policies purchased by the PLAINTIFFS are not sustainable without additional costs to the PLAINTIFFS above and beyond the premiums they anticipated while the present value of the policies is nominal.  In short, the purchase of the insurance sold to PLAINTFFS by DEFENDANTS has been a financial disaster to PLAINTIFFS, all as a proximate result of the fraud, concealment and wrongdoing of the DEFENDANTS, and each of them as described herein.

## FIRST CAUSE OF ACTION:  FRAUD AND MISREPRESENTATION

### (As to DEFENDANTS HAHN, ARCHIBALD, PORT CAPITAL, AMERICAN GENERAL

### ALLIANZ LIFE

### DB ALEX BROWN, INSURATIVE)

83.     PLAINTIFFS incorporate Paragraphs 1-82 in this First Cause of Action as though they were fully set forth herein.

84.     In carrying out the sale of life insurance products to PLAINTIFFS, said DEFENDANTS made numerous material misrepresentations and  omissions of material fact which were made either intentionally or in reckless disregard of information that such were untrue when made, which were communicated to PLAINTIFFS, or omitted, in order to induce PLAINTIFFS enter into and authorize the transactions, including the loan transaction, described herein as follows:

      a.  Using fraud, concealment and deceptive sales practices, persuaded PLAINTIFFS that they could obtain "free life insurance" through their expertise in premium financing;

      b.  Using fraud, concealment and deceptive sales practices, persuaded PLAINTIFFS to purchase the AIG Life Policy and the ALLIANZ LIFE

Policy with death benefits that were excessive, unnecessary and unsuitable for each of them;

c. Using fraud, concealment and deceptive sales practices, provided PLAINTIFFS with false and misleading life insurance illustrations and projections showing the future value of the policies and cash build up;

d. Using fraud, concealment and deceptive sales practices, advised PLAINTIFFS that it was in their best financial interest to borrow substantial sums of money from INSURATIVE to pay the premiums for the life polices that were being sold by DEFENDANTS, when in fact this was not true;

e. Using fraud, concealment and deceptive sales practices, persuaded PLAINTIFFS to set up trusts as owners of the life insurance polices being sold by DEFENDANTS, which trusts were unnecessary and prepared by agents of DEFENDANTS who were acting only in the financial interests of DEFENDANTS and contrary to the financial interests of PLAINTIFFS;

f. Using fraud, concealment and deceptive sales practices by falsely advising the PLAINTIFFS that the accumulated cash value in the two life insurance policies on M. and S. MYERS' lives would exceed the loan values of the premium financing;

g. Using fraud, concealment and deceptive sales practices, intentionally failing to disclose to the PLAINTIFFS the history of the related interest rates on the life insurance policies, which would have demonstrated to the PLAINTIFFS that their policies' values would not grow to exceed the value of the premium financing loans;

h. Using fraud, concealment and deceptive sales practices, intentionally failing to provide the PLAINTIFFS with a comparison of the costs of the financed premium with the cost of traditional annual premiums for life insurance for the same carriers, which would have demonstrated to the PLAINTIFFS that the cost of the interest on the INSURATIVE loans was greater than the cost of

paying traditional annual premiums for insurance policies from the same carrier;

i.  Using fraud, concealment and deceptive sales practices, failing to advise PLAINTIFFS of alternative means, including purchasing term insurance at a much lower premium (without borrowing), which would provide suitable and appropriate life insurance benefits for PLAINTIFFS to utilize in their estate planning;

j.  Using fraud, concealment and deceptive sales practices, not informing PLAINTIFFS of the substantial commissions that DEFENDANTS would earn as a result of the sale of the life insurance policies;

k.  Using fraud, concealment and deceptive sales practices, preparing false and misleading financial statements regarding PLAINTIFFS in order to obtain the amount of the death benefit on the life insurance policies being sold and the premium financing loan;

l.  .Using fraud, concealment and deceptive sales practices, communicating false and misleading information about the mechanism of the transactions leading to the purchase of the life insurance polices issued by the DEFENDANT insurers, including the need for and availability of a letter of credit and a collateral account to secure the premium financing obtained;

m.  Using fraud, concealment and deceptive sales practices, communicating false and misleading information regarding the financial risks to PLAINTIFFS in entering into the transactions for purchase of the life insurance issued by DEFENDANT insurers, which risks were much substantial;

n.  Using fraud, concealment and deceptive sales practices, allowing assets used as collateral/security for the premium financing to be transferred from DB ALEX BROWN to Oppenheimer Bank which detrimentally affected PLAINTIFFS  financially and led to the default on the premium financing loan and its call by INSURATIVE;

o.  Using fraud, concealment and deceptive sales practices, cooperated in allowing the transfer of the cash value, after a substantial surrender charge was applied, of the AIG Life Policy to ING for purchase of a new life insurance policy to replace the former;

p.  Using fraud, concealment and deceptive sales practices, falsely misled PLAINTIFFS into entering into the transactions described herein which were detrimental to the financial interests of PLAINTIFFS for the purpose of generating large and substantial commissions for DEFENDANTS which were excessive and unnecessary in order to obtain appropriate life insurance policies for PLAINTIFFS;

q.  Using fraud, concealment and deceptive sales practices, falsely advising PLAINTIFFS as to the terms and conditions of the INSURATIVE premium financing loan;

r.  Using fraud, concealment and deceptive sales practices, declaring a default on the INSURATIVE premium financing loan when such was not permitted under the loan agreement, or misinterpreting the terms of such so as to have a basis for declaring the loan in default, when it was not in default or there were provisions for curing such;

s.  Using fraud, concealment and deceptive sales practices, allowing PLAINTIFFS to enter into life insurance transactions that resulted in their being insured in amounts and under terms that were unsuitable, unnecessary and unsuitable for them;

t.  Using fraud, concealment and deceptive sales practices, continuing to assure PLAINTIFFS that the life insurance purchased was suitable for their purpose, and continuing to encourage PLAINTIFFS to maintain such polices in effect;

u.  Using fraud, concealment and deceptive sales practices, failing to disclose to PLAINTIFFS that INSURATIVE was seeking capital in the Spring of 2009, prior to the call of the PLAINTIFFS' INSURATIVE loans, and that the loan

default was declared because of this need and not because it was actually in default;

v. Using fraud, concealment and deceptive sales practices, failing to disclose to PLAINTIFFS the true reasons why HAHN left DB ALEX BROWN at the time of his departure to Oppenheimer;

w. Using fraud, concealment and deceptive sales practices, intentionally concealing from PLAINTIFFS the necessity of informing INSURATIVE regarding the transfer of collateral assets supporting the premium loan to other than DB ALEX BROWN;

x. Using fraud, concealment and deceptive sales practices, applying improper underwriting standards for determining the suitability of issuing the life insurance polices described herein with the death benefits and for the premiums to maintain such;

y. Using fraud, concealment and deceptive sales practices, intentionally failed to disclose to PLAINTIFFS that HAHN, ARCHIBALD and PORT CAPITAL did not comply with Nevada licensing laws for financial planners and insurance brokers.

85.     At all relevant times, the false and misleading statements herein described were material to the PLAINTIFFS; PLAINTIFFS reasonably and justifiably relied on them to their detriment, and were unaware of their falsity at the time these false and misleading statements were communicated to them.

86.     The representations were made by DEFENDANTS with the intention to defraud PLAINTIFFS, and to induce PLAINTIFFS into entering into the transactions described herein which led to the purchase of insurance on their lives.

87.     By reason of the DEFENDANTS' intentional misrepresentations, as described herein, PLAINTIFFS have been damaged in an amount in the millions of dollars, far in excess of the jurisdictional limits of $75,000 for this Court.   The PLAINTIFFS are entitled to an award of compensatory damages in the form of the loan payments, transactional costs, fees and commissions and

1  related expense that would not have been incurred or paid if the wrongdoing of the DEFENDANTS as

2  described herein had not occurred.

3         88.     The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or

4  oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an

5  example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted

6  under Nevada Revised Statutes ("NRS"), Chapter 42.

7         WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

8              **SECOND CAUSE OF ACTION:  FRAUDULENT CONCEALMENT**

9     **(As to DEFENDANTS HAHN, ARCHIBALD, PORT CAPITAL, AMERICAN GENERAL**

10                                  **ALLIANZ LIFE**

11                       **DB ALEX BROWN, INSURATIVE)**

12        89.     PLAINTIFFS incorporate Paragraphs 1-88 into this Second Cause of Action as thought

13  they were fully set forth herein.

14        90.     DEFENDANTS intentionally concealed information from the PLAINTIFFS as set forth

15  above in the First Cause of Action.  By virtue of the fiduciary, confidential, and/or special relationship

16  between the PLAINTIFFS and DEFENDANTS, as well as applicable Nevada statues, DEFENDANTS

17  had a duty to disclose the facts that were concealed.

18        91.     DEFENDANT named in this cause of action had a duty to inform the PLAINTIFFS of

19  the subject concealments described above based on fiduciary duty, contractual relationship or good faith

20  obligations.  Each DEFENDANT breached that duty by intentionally concealing or suppressing the

21  information in order to induce the completion of the subject transactions to their financial advantage and

22  to the economic detriment of the PLAINTIFFS.

23        92.     The facts concealed were material to the transactions described herein; had the true facts

24  been known, PLAINTIFFS would not have entered into the transactions which are the subject of this

25  Complaint and would not have suffered the financial injury so described.

26        93.     By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are

27  entitled to the compensatory and punitive damages claimed herein.

28  / / /

94.     The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS, Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

### THIRD CAUSE OF ACTION:  FRAUD AND MISREPRESENTATION

### (As to HAHN, ARCHIBALD, PORT CAPITAL, AMERICAN GENERAL and ING)

95.     PLAINTIFFS incorporate Paragraphs 1-94 in this Third Cause of Action as though they were fully set forth herein.

96.     In carrying out the sale of life insurance products to PLAINTIFFS and the trusts, said DEFENDANTS made numerous material misrepresentations and omissions of material fact which were made either intentionally or in reckless disregard of information that such were untrue when made, which were communicated to PLAINTIFFS, or omitted, in order to induce PLAINTIFFS enter into and authorize the transaction resulting in the transfer for assets from the AIG Life Policy on the life of S. MYERS to a policy with nearly the same death benefit issued by ING, including the loan transaction, described herein:

    a.     Using fraud, concealment and deceptive sales practices, persuaded PLAINTIFFS to purchase the ING Policy to replace the AIG Life Policy, with death benefits that were excessive, unnecessary and unsuitable;

    b.     Using fraud, concealment and deceptive sales practices by providing PLAINTIFFS with false and misleading life insurance illustrations and projections showing the future value of the policies and cash build-up;

    c.     Using fraud, concealment and deceptive sales practices by advising PLAINTIFFS that it was in their best financial interest to continue to borrow substantial sums of money from to pay the premiums for the ING Policy;

///

///

d.   Using fraud, concealment and deceptive sales practices, not informing PLAINTIFFS of the substantial commissions that DEFENDANTS would earn as a result of the sale of the replacement ING Policy;

e.   Using fraud, concealment and deceptive sales practices by failing to advise PLAINTIFFS of the adverse financial consequences of the application of a substantial surrender value of cash in the AIG Life Policy which could not be transferred to the ING Policy, and that cost of the replacement had an adverse financial impact on PLAINTIFFS;

f.   Using fraud, concealment and deceptive sales practices, cooperated in allowing the transfer of the cash value, after a surrender charge was applied, of the AIG Life Policy to ING for purchase of a new life insurance policy to replace the former;

g.   Using fraud, concealment and deceptive sales practices, allowing PLAINTIFFS to enter into life insurance transaction that resulted in their being insured in amounts and under terms that were unsuitable and unnecessary for S. MYERS;

h.   Using fraud, concealment and deceptive sales practices, continuing to assure PLAINTIFFS that the life insurance purchased was suitable for them, and  continuing to encourage PLAINTIFFS to maintain the ING Policy in effect;

i.   Using fraud, concealment and deceptive sales practices by applying improper underwriting standards for determining the suitability of issuing the ING Policy with the death benefits and for the premiums to maintain such;

j.   Using fraud, concealment and deceptive sales practices, intentionally failed to disclose to PLAINTIFFS that HAHN, ARCHIBALD and PORT CAPITAL did not comply with Nevada licensing laws for financial planners and insurance brokers.

97.   At all relevant times, the false and misleading statements herein described were material to the PLAINTIFFS; PLAINTIFFS reasonably and justifiably relied on them to their detriment, and were unaware of their falsity at the time these false and misleading statements were communicated to them.

/ / /

/ / /

98.     The representations were made by DEFENDANTS with the intention to defraud PLAINTIFFS, and to induce PLAINTIFFS into entering into the transactions described herein which led to the purchase of insurance on their lives.

99.     By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory and punitive damages claimed herein.

100.    The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS, Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

## FOURTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT

## (As to HAHN, ARCHIBALD, PORT CAPITAL, AMERICAN GENERAL and ING)

101.    PLAINTIFFS incorporate Paragraphs 1-100 into this Fourth Cause of Action as though were fully set forth herein.

102.    DEFENDANTS intentionally concealed information from the PLAINTIFFS as set forth above in the Third Cause of Action.  By virtue of the fiduciary, confidential, and/or special relationship between the PLAINTIFFS and DEFENDANTS, as well as applicable Nevada statues, DEFENDANTS had a duty to disclose the facts that were concealed.

103.    DEFENDANTS named in this cause of action had a duty to inform the PLAINTIFFS of the subject concealments described above based on fiduciary duty, contractual relationship or good faith obligations.  Each DEFENDANT breached that duty by intentionally concealing or suppressing the information in order to induce the completion of the subject transactions to their financial advantage and to the economic detriment of the PLAINTIFFS.

104.    The facts concealed were material to the transactions described herein; had the facts been disclosed, PLAINTIFFS would not have entered into the transactions which are the subject of this Complaint and would not have suffered the financial injury so described.

105.    By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are

entitled to the compensatory and punitive damages claimed herein.

106.    The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages, to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS, Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

## FIFTH CAUSE OF ACTION:  NEGLIGENT MISREPRESENTATION AND CONCEALMENT
### (As to all DEFENDANTS)

107.    Plaintiffs incorporate Paragraphs 1-106 in this Fifth Cause of Action as though they were fully set forth herein.

108.    The DEFENDANTS, and each of them, have negligently made false representations as set forth in the First and Third Causes of Action to the PLAINTIFFS to facilitate and encourage their participation in the subject transactions.  Similarly they have negligently concealed the true facts as outlined in the Second and Fourth Causes of Action from the Plaintiffs.  At the time that the representations or concealment occurred, DEFENDANTS had no reasonable grounds for believing that these representations were true.  Said representations and the concealments resulted from the negligence of DEFENDANTS, and each of them, and resulted from DEFENDANTS having sufficient knowledge to make them or for them to have been concealed.  DEFENDANTS were aware, or reasonably should have been aware, that they had insufficient information or knowledge to make any of said representations, and negligently allowed PLAINTIFFS to be unaware of those facts concealed.

109.    PLAINTIFFS reasonably and justifiable relied on the false representations of the DEFENDANTS to their detriment.

110.    By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory claimed herein.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER

### SIXTH CAUSE OF ACTION: BREACH OF CONTRACT & WAIVER
### (As to DEFENDANT INSURATIVE)

111.    PLAINTIFFS incorporate Paragraphs 1-110 in this Sixth Cause of Action as though they were fully set forth herein.

112.   PLAINTIFFS entered into valid contracts with DEFENDANT INSURATIVE. (**EXHIBIT 2; EXHIBIT 8**).

113.   DEFENDANT INSURATIVE breached the terms of the contracts by asserting a default in the loans made to PLAINTIFFS and demanding immediate repayment of the principal, interest, expenses and extra-contractual penalties.  INSURATIVE asserted that the loan default was caused by a breach of the default provisions in the INSURATIVE loan contract at clause 14.1 (**EXHIBIT 2,** p. 14), which includes but is not limited to, failure to pay and misrepresentation.  INSURATIVE stated that unpaid amounts on the loans would be enforced against the life policies held by the trust and the DB ALEX BROWN letter of credit.

114.   INSURATIVE was aware that PLAINTIFF had neither misrepresented information to them, nor failed to pay on the loan.  INSURATIVE was further aware that no letter of credit or collateral account had been established at DEUTSCHE BANK, yet provided the funding to the trust, thereby waiving the requirement for the satisfaction of the conditions precedent.  INSURATIVE was further aware that the PLAINTIFFS' net worth had not diminished and their assets had been moved to another bank by DEFENDANT HAHN in cooperation with ARCHIBALD.

115.   Thereafter, DEFENDANT INSURATIVE demanded accelerated repayment of all outstanding loan amounts (**EXHIBIT 2**, p. 19).  Pursuant to the contract, accelerated payment can only be demanded upon a default.

116.   By demanding immediate repayment of the loan and penalties without contractual justification, INSURATIVE failed to honor the terms of the contract..

117.   By its conduct, INSURATIVE breached its contract resulting in PLAINTIFFS' financial loss.

118.   By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory claimed herein.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

///

///

///

## SEVENTH CAUSE OF ACTION:  BREACH OF FIDUCIARY DUTY

### (As to DEFENDANTS HAHN, ARCHIBALD and PORT CAPITAL)

119.   Plaintiffs incorporate Paragraphs 1-118 in this Seventh Cause of Action as though they were fully set forth herein.

120.   The DEFENDANTS, HAHN, ARCHIBALD, and PORT CAPITAL and each of them, in their various capacities, were fiduciaries of the PLAINTIFFS.  By reason of DEFENDANTS' fiduciary duties owed to the benefit of the PLAINTIFFS, DEFENDANTS became obligated under Nevada law to protect the PLAINTIFFS' best interest.

121.   DEFENDANTS, HAHN, PORT CAPITAL and ARCHIBALD, and each of them, breached their fiduciary duties owed to the PLAINTIFFS.  Specifically, the consistently failed to act in the best interest of the PLAINTIFFS by intentionally misrepresenting and/or omitting material information in the sale and financing of PLAINTIFFS' life insurance policies; by negligently representing and/or omitting material information in the sale and financing of PLAINTIFFS' life insurance policies; by mishandling the PLAINTIFFS' funds; by misrepresenting material information related to the viability of S. MYERS' AMERICAN GENERAL Policy and capitalizing on PLAINTIFFS' consequential fear to generate undisclosed commissions for themselves.

122.   By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory damages claimed herein.

123.   The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

## EIGHTH CAUSE OF ACTION: PROFESSIONAL NEGLIGENCE

### (HAHN, ARCHIBALD AND PORT CAPITAL)

124.   Plaintiffs incorporate Paragraphs 1-123 in this Eighth Cause of Action as though they were fully set forth herein.

/ / /

125.    These DEFENDANTS owed a duty as investment and insurance professionals to Plaintiffs to use such skill, prudence, and diligence as other members of the insurance profession commonly possess and exercise.

126.    These DEFENDANTS breached that duty to Plaintiffs as described herein, which proximately resulted in the damages claimed by PLAINTIFF herein.

127.    By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory damages claimed herein.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

### NINTH CAUSE OF ACTION:  UNJUST ENRICHMENT

### (As to all DEFENDANTS)

128.    Plaintiffs incorporate Paragraphs 1-127 in this Ninth Cause of Action as though they were fully set forth herein.

129.    DEFENDANTS, and each of them, have been unjustly enriched by diverting for their own use and benefit, or facilitating the diversion of the PLAINTIFFS' assets, as described in the preceding paragraphs, to the detriment of the PLAINTIFFS.

130.    DEFENDANTS' conduct is designed to divert money away from the PLAINTIFFS, to take money and profits away from the PLAINTIFFS, and to benefit from such conduct without providing any relief or compensation to the PLAINTIFFS.

131.    By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory damages claimed herein.

132.    The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS, Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

### TENTH CAUSE OF ACTION:  CONSPIRACY

### (As to all DEFENDANTS)

133.    Plaintiffs incorporate Paragraphs 1-132 in this Tenth Cause of Action as though they were fully set forth herein.

134.   DEFENDANTS have formed an association by agreement with the unlawful objective of completing valuable transactions to obtain financial advantage by selling high-value life insurance products with premium financing to individuals of substantial wealth, such as the PLAINTIFFS.  The benefits obtained by DEFENDANTS were obtained by unlawful overt acts, as fully alleged above, including fraudulent misrepresentation, fraudulent concealment, breach of contract, breach of fiduciary and professional duties, unjust enrichment and conversion to the detriment of PLAINTIFFS.

135.   DEFENDANTS performed these overt acts in concert in furtherance of their conspiratorial aim: to defraud the PLAINTIFFS and obtain financial advantage for themselves.

136.   By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory damages claimed herein.

137.   The conduct of the DEFENDANTS as described herein was fraudulent, malicious, and/or oppressive so as to entitle PLAINTIFFS to claim and seek punitive damages in order to make an example of DEFENDANTS and deter others from engaging in the same or similar conduct as permitted under NRS, Chapter 42.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

### ELEVENTH CAUSE OF ACTION: VIOLATION OF CONSUMER LAWS
### (As to all DEFENDANTS)

138.   Plaintiffs incorporate Paragraphs 1-137 in this Eleventh Cause of Action as though they were fully set forth herein.

139.   DEFENDANTS have engaged in unfair trade practices in the sale of insurance, as defined in NRS 686A, as fully alleged above.  Specifically, DEFENDANTS have violated NRS 686A.030 by issuing life insurance estimates, illustrations, statements and comparisons which misrepresented the benefits, advantages, conditions and terms of the insurance policies marketed and sold to PLAINTIFFS.  DEFENDANTS also intentionally misrepresented the financial condition of the legal reserve system upon which the life insurer operates to induce PLAINTIFFS to surrender an extant policy.

/ / /

/ / /

140.    DEFENDANTS further violated NRS 686A.050 by issuing written and oral statements misrepresenting and intentionally misleading the benefits or advantages of an insurance policy for the purpose of inducing PLAINTIFFS to surrender a policy and replace it with another.

141.    DEFENDANTS have engaged in deceptive trade practices in the course of their business, as fully alleged above, in violation of NRS 598.092, by committing each of the following acts:

        a.    offering PLAINTIFFS an opportunity for investment and representing that their investment would be protected in a manner which each DEFENDANT knew to be false;

        b.    misrepresenting the rate of return on PLAINTIFFS' investment;

        c.    making untrue statements and concealing material information from the PLAINTIFFS with the intention to mislead them;

        d.    failing to comply with the laws and regulations regarding the marketing of life insurance plans, including NRS 686A.050; and

        e.    knowingly misrepresenting the legal rights, obligations or remedies available to the PLAINTIFFS prior to, throughout and after the completion of their transactions.

142.    DEFENDANTS have engaged in deceptive trade practices in the course of their business, as fully alleged above, in violation of NRS 598.0923, by knowingly performing each of the following acts:

        a.    Conducting their business without all the required state, county or city licenses;

        b.    Failing to disclose material facts to PLAINTIFFS in connection with the sale of life insurance policies.

143.    DEFENDANTS have failed to comply with the requirements of Nevada Revised Statute governing the Financing of Premiums, as fully alleged above, by failing to obtain appropriate licensing as required by NRS 686A.340; failing to report to the Nevada Insurance Commissioner a schedule of rates and commissions earned on the transactions completed for PLAINTIFFS as required by NRS 686A.385; failing to comply with the requirement for premium financing agreements, as described in NRS 686A.420.

144.   By reason of DEFENDANTS' conduct, PLAINTIFFS were forced to retain counsel to prosecute this action against DEFENDANTS.  PLAINTIFFS are entitled to recover their attorneys' fees and costs against DEFENDANTS.

145.   By reason of the wrongful conduct of DEFENDANTS described herein PLAINTIFFS are entitled to the compensatory and punitive damages claimed above.

WHEREFORE, PLAINTIFFS pray for relief as set forth in their PRAYER.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS expressly reserving their rights to amend this complaint prior to or at the time of trial of this action, to insert those items of damages not fully ascertainable, pray for judgment against DEFENDANTS, and each of them, on each Cause of Action, and for the following relief:

A.   For an award of compensatory damages in an amount according to proof at trial, including special damages;

B.   For punitive damages as permitted in NRS 42.005 and NRS 42.007 in an amount sufficient to deter, punish and make an example of DEFENDANTS;

C.   For treble damages as permitted under the law;

D.   For an award of costs and attorneys' fees as permitted by law;

E.   For pre-judgment and post-judgment interest as permitted under the law;

F.   For such other relief as the Court deems just and proper.

Dated: April 29, 2010

Respectfully submitted,

PORTER SIMON
Professional Corporation

By: _____
BRIAN C. HANLEY
Attorneys for Plaintiffs,
SUSAN K. MYERS and MICHAEL F. MYERS